UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                  Case No. 2:16-mj-21
                                                   HON. TIMOTHY P. GREELEY

ROY P. HINKSON,

    Defendant.
_____/

## **OPINION AND ORDER**

        Roy P. Hinkson is not the typical criminal defendant in federal court. He is a 69-year-old, retired, Purple Heart recipient, who has never faced any criminal charges in his life. That changed, however, on November 15, 2014, when the US Forest Service charged Hinkson with constructing a camp on National Forest System land without obtaining the necessary authorization in violation of 36 C.F.R. § 261.10(a).[1] The charged offense is a Class B misdemeanor and is punishable by a fine not more than $500 or by imprisonment for not more than six months or both. 36 C.F.R. § 261.1b. After a bench trial on May 31, 2017, the Court took the charge under advisement. For the reasons stated below, the Court finds that Hinkson is not guilty of violating 36 C.F.R. § 261.10(a).

        At first glance, the facts in this case seem straightforward. Hinkson appears to be an owner of a camp that is located on Hiawatha National Forest land—approximately 200 feet away from his private property. However, to truly understand the relevant circumstances of this case, it is necessary to go back sixty-five years to consider how the camp ended up being built in this location. During the 1950s, Alfred Repp owned a forty acre parcel of land located in Schoolcraft County,

---

[1] The Government also charged Hinkson with snowplowing a road on National Forest System land without the necessary permit in violation of 36 C.F.R. § 261.10(a). During the bench trial held on May 31, 2017, the Court dismissed this charge against Hinkson because the Government failed to prove beyond a reasonable doubt that Hinkson personally snowplowed the road or that he instructed any other individual to snowplow the road. See 18 U.S.C. § 2.

Michigan. The parcel was completely surrounded by the Hiawatha National Forest. At some point in the 1950s, Repp mistakenly built a small hunting cabin across his private property boundary line and on Hiawatha National Forest land. Although Hinkson and his parents did not have any ownership interest in the cabin or parcel of land, Hinkson's parents were close friends with Repp, and the Hinksons often used the cabin during deer hunting season. Specifically, Hinkson remembers using the cabin for deer hunting after he returned home from serving in the Vietnam War in the late 1960s.

In the fall of 1976, a fire destroyed the original hunting cabin. Many people, including Hinkson, helped clear the debris from the fire. Notably, Hinkson testified that several members of the US Forest Service assisted in cleaning the debris. In addition to Hinkson's testimony, photographs admitted during trial depict at least ten US Forest Service employees—wearing yellow jackets that have the US Forest Service patch on the shoulder—working at the cabin site shortly after the fire. During the clean-up, members of the US Forest Service asked Repp to rebuild the cabin twenty-five feet east of where the original cabin was erected to ensure that the new cabin was squarely on private property. Following those instructions, in 1978, Repp built the new cabin east of the original cabin site. This cabin—erected in 1978—is the same cabin that is at issue in this case.[2]

Since 1978, the cabin has been frequently used without anyone suspecting that it encroaches on National Forest System land. In order to access the cabin, one must drive on a road that is also on National Forest System land. Over the years, a gate was built on this road. The gate has a locking mechanism and one of the keys was provided to the US National Forest Service. Hinkson testified that the key should still be hanging in the Manistique Ranger District office.

---

[2] Over the years, the ownership of the cabin and the parcel of land changed. Repp eventually sold half of his ownership interest to Hinkson's parents. When Repp passed away, Hinkson's parents became the sole owners. At some point, the property was placed in the Hinkson Family Trust. It appears that Hinkson inherited some type of ownership in the camp when his father passed away. Apparently, Hinkson's ownership became official in 2013, when a property deed was properly recorded. However, at trial, Hinkson's testimony suggested that his mother still owns some interest in the property.

In June 2014, while using Google Earth in his office, National Forest Officer David Tembruell noticed that the cabin appeared to be located on National Forest System land. On July 20, 2014, Officer Tembruell and another officer went to investigate the cabin with GPS trackers. The officers discovered the cabin, the road with the gate, a "no trespassing" sign, and six hunting blinds. After plugging in the GPS coordinates, the officers determined that the property was likely on National Forest System land. Shortly thereafter, Officer Tembruell requested a survey, and a surveyor subsequently confirmed that the cabin encroached National Forest System land.

Instead of notifying the owner by leaving a note or sending a letter in the mail, the US National Forest Service set up a sting-like operation for the opening day of deer hunting season. On the morning of November 15, 2014, officers from both the US National Forest Service and the Michigan Department of Natural Resources swarmed the deer hunting blinds and subsequently brought the hunters back to the camp.[3] Hinkson was one of the hunters. When Hinkson arrived back at the camp, Officer Tembruell informed Hinkson that the camp was on National Forest System land.

According to Officer Tembruell, the hunters had committed at least 30 different violations. However, the officers only issued three tickets—Hinkson was issued two CVB Tickets, and Hinkson's son was issued a CVB Ticket for having a permanent deer blind on federal property. CVB Ticket 3653364 charged Hinkson with "Camp Constructed on NFSL" in violation of 36 C.F.R. § 261.10(a). Within the next day, Hinkson and the other hunters removed most of the temporary structures. However, the cabin, a permanent structure, still remains in the same location.[4]

---

[3] The hunters in the deer blinds were undoubtedly armed with high powered rifles. It is hard to imagine why law enforcement decided to proceed in this fashion. Fortunately, no one was hurt.

[4] Hinkson has been attempting to work out an arrangement with the US Forest Service so he does not have to destroy the camp. He has offered to buy the land or trade some of his land with the US Forest Service. As of today, the parties have not reached an agreement. This case involves only the criminal charges against Hinkson and does not affect the parties' negotiations. Why this matter cannot be resolved amicably remains a mystery that contradicts logic.

Pursuant to the authority in 16 USC § 551, the Secretary of Agriculture has promulgated rules and regulations to control the occupancy and use of National Forest lands. *See* 36 C.F.R. Part 261. Here, Hinkson is charged with violating 36 C.F.R. § 261.10(a), which prohibits:

> Constructing, placing, or maintaining any kind of road, trail, structure, fence, enclosure, communication equipment, significant surface disturbance, or other improvement on National Forest System lands or facilities without a special-use authorization, contract, or approved operating plan when such authorization is required.

According to the plain language of the regulation, the Government must prove beyond a reasonable doubt that (1) Hinkson constructed, placed, or maintained the camp, (2) the camp was located on National Forest System lands, and (3) there was no special-use authorization, contract, or approved operating plan if such authorization was required.

The parties dispute whether the Court should imply a *mens rea* requirement to this regulation. Hinkson argues that without a *mens rea* requirement, the regulation would criminalize a broad range of apparently innocent conduct. Thus, Hinkson urges the Court to imply a "reckless" scienter requirement to the regulation. The Government maintains that the regulation is a strict liability offense.

The traditional rule is that proof of a guilty mind is required to convict a person of a crime. *See Staples v. United States,* 511 U.S. 600, 605-06 (1994) (citing *United States v. Balint,* 258 U.S. 250, 251-53 (1922)). "Relying on the strength of the traditional rule, [the Supreme Court has] stated that offenses that require no *mens rea* generally are disfavored, . . . and have suggested that some indication of congressional intent, express or implied, is required to dispense with *mens rea* as an element of a crime." *Id.* (citations omitted). However, the courts have found statutes or regulations do not require a *mens rea* element when they are considered public welfare offenses. *See Morissette v. United States,* 342 U.S. 246, 255 (1952).

In *United States v. Kent*, 945 F.2d 1441, 1445 (9th Cir. 1991), the Ninth Circuit considered whether the language in a similar regulation, 36 C.F.R. § 261.10(b),[5] implied a *mens rea* element. The case involved an Indian who established her residence on national forest land and claimed that she had authorization under federal law. *Id.* at 1442-43. Despite initially issuing an opinion that held the regulation implied a *mens rea* element, the court withdrew its prior opinion and held that the regulation was a strict liability offense. *Id.* at 1443. Although the court acknowledged that "[s]trict criminal liability is strong medicine," it determined that the language of the regulation did not imply a requisite state of mind. *Id.* at 1446. The court also relied on a previous decision in which it held that the regulation that prohibits cutting and removing timber from a national forest did not imply a *mens rea* requirement. *Id.* (citing *United States v. Wilson,* 438 F.2d 525, 525 (9th Cir. 1971)). Based on *Wilson*, the court stated: "We do not see how one who wanders onto a national forest and cuts trees can be held strictly liable when one who wanders on and establishes a residence is not." *Id.*

The dissenting opinion in *Kent* criticized the majority's interpretation of § 261.10(b) and stated that it would "'criminalize a broad range of apparently innocent conduct[.]'" *Id.* at 1449 (Pregerson, J., dissenting) (quoting *Liparota v. United States,* 471 U.S. 419, 426 (1985)). Thus, the dissent would have interpreted the regulation as requiring the defendant to know that her conduct was unauthorized. *Id.* at 1448 (Pregerson, J., dissenting). The dissent further explained that § 261.10(b) was not a public welfare offense because "[o]ccupation of Forest Service lands is not an inherently dangerous activity, and the government ha[d] not submitted any evidence that [the defendant's] occupancy endangered the public." *Id.* at 1448 (Pregerson, J., dissenting). To distinguish the holding in *Wilson*, the dissent stated:

> In *Wilson*, we held that the Forest Service's regulation prohibiting the cutting of timber in the national forests is a strict liability offense. The

---

[5] 36 C.F.R. § 261.10(b) (1990) prohibited: "Taking possession of, occupying, or otherwise using National Forest System lands for residential purposes without a special-use authorization, or as otherwise authorized by Federal law or regulation."

> cutting of timber, however, is a "public welfare offense" that causes irreparable harm to our national forests. On the other hand, a mere occupier of land like Kent does not "seriously threaten the community's health or safety" and can be ejected in a civil action.

*Id.* at 1448 (Pregerson, J., dissenting). In addition to the *mens rea* issue, the dissent also believed that the conviction could not stand based on due process principles because the defendant did not have sufficient notice that her occupancy on national forest land was illegal. *Id.* at 1448.

In the Sixth Circuit, whether § 261.10(a) requires a *mens rea* element and is a strict liability offense is an open question. A few courts that have specifically addressed whether § 261.10(a) requires a *mens rea* element have found that it is a public welfare offense and, therefore, a strict liability offense. *See, e.g.*, *United States v. Freed*, 189 F. App'x 888, 892 (11th Cir. 2006); *United States v. Good*, 257 F. Supp. 2d 1306 (D. Colo. 2003). The language of § 261.10(a) is silent to whether there is a *mens rea* element. However, 36 C.F.R. § 261.1(c), which defines the scope of the regulations in 36 C.F.R. § 261 Subpart A, provides: "[u]nless an offense set out in this part specifies that intent is required, intent is not an element of any offense under this part."[6]

In the instant case, the offense charged and the facts as both parties recognize them, fail to establish a public welfare offense. In *Liparota v. United States*, 471 U.S. 419 (1985), the Supreme Court explained:

> [T]he Government contends that the § 2024(b)(1) offense is a "public welfare" offense, which the Court defined in *Morissette v. United States*, 342 U.S., at 252–253, 72 S.Ct., at 244–245, to "depend on no mental element but consist only of forbidden acts or omissions." Yet the offense at issue here differs substantially from those "public welfare offenses" we have previously recognized. In most previous instances, Congress has rendered criminal a type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety. Thus, in *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), we examined the federal statute making it illegal to receive or possess an unregistered firearm. In holding that the Government did not have to prove that the recipient of unregistered hand grenades knew that they were unregistered, we

---

[6] 36 CFR § 261.1(c) was amended to include this provision in 2008. 73 FR 30307, May 27, 2008.

> noted that "one would hardly be surprised to learn that possession of hand grenades is not an innocent act." *Id.*, at 609, 91 S.Ct., at 1118. See also *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 564–565, 91 S.Ct. 1697, 1701–1702, 29 L.Ed.2d 178 (1971). Similarly, in *United States v. Dotterweich*, 320 U.S. 277, 284, 64 S.Ct. 134, 138, 88 L.Ed. 48 (1943), the Court held that a corporate officer could violate the Food, Drug, and Cosmetic Act when his firm shipped adulterated and misbranded drugs, even "though consciousness of wrongdoing be totally wanting." See also *United States v. Balint*, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922). The distinctions between these cases and the instant case are clear. A food stamp can hardly be compared to a hand grenade, see *Freed*, nor can the unauthorized acquisition or possession of food stamps be compared to the selling of adulterated drugs, as in *Dotterweich*.
>
> We hold that in a prosecution for violation of § 2024(b)(1), the Government must prove that the defendant knew that his acquisition or possession of food stamps was in a manner unauthorized by statute or regulations. This holding does not put an unduly heavy burden on the Government in prosecuting violators of § 2024(b)(1). To prove that petitioner knew that his acquisition or possession of food stamps was unauthorized, for example, the Government need not show that he had knowledge of specific regulations governing food stamp acquisition or possession. Nor must the Government introduce any extraordinary evidence that would conclusively demonstrate petitioner's state of mind. Rather, as in any other criminal prosecution requiring *mens rea*, the Government may prove by reference to facts and circumstances surrounding the case that petitioner knew that his conduct was unauthorized or illegal.

*Id.* at 432-34 (footnotes omitted). The Supreme Court has also remarked that:

> Even statutes creating public welfare offenses generally require proof that the defendant had knowledge of sufficient facts to alert him to the probability of regulation of his potentially dangerous conduct. See *Staples v. United States*, 511 U.S. 600, 607, n. 3, 114 S.Ct. 1793, 1798, n. 3, 128 L.Ed.2d 608 (1994); *United States v. Dotterweich*, 320 U.S. 277, 281, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943).

*Posters'N'Things, Ltd. v. United States*, 511 U.S. 513, 522-23 (1994).

The Court concludes that the facts of this case cannot support a conviction for the offense charged. There is no suggestion that Hinkson had any reason to believe that he was in violation of the regulation. In fact, the evidence of record suggests that the US Forest Service had given him reason to believe that he was in full compliance with the regulation, as it was the US

7

Forest Service who suggested where the cabin should be built. To convict Hinkson of the offense charged without any scienter requirement smacks of unfairness. Moreover, there is no support for a conclusion that Hinkson's conduct amounted to a "public welfare offense."

Alternatively, the Court finds that the Government failed to prove beyond a reasonable doubt that Hinkson committed a violation. As described above, to find Hinkson guilty of violating § 261.10(a), the Government must prove that (1) Hinkson constructed, placed, or maintained the camp, (2) the camp was located on National Forest System lands, and (3) there was no special-use authorization, contract, or approved operating plan if such authorization was required. The Government met its burden on the second and third elements. The evidence presented at trial established that the camp currently rests on National Forest System lands. Similarly, the evidence presented at trial established that Hinkson did not have a special-use authorization, contract, or approved operating plan. Therefore, the question in this case is whether the Government met its burden as to the first element.

To begin the discussion of the first element, the Court notes the confusion that arises from multiple errors in the charging document—CVB Ticket 3653364. The ticket identifies the date of the offense as November 15, 2014. The "Offense Charged" is 36 C.F.R. § 261.10(a). The "Offense Description" is "Camp Constructed on NFSL." In the "Statement of Probable Cause," the investigation is described and concludes that the violation was written for "possessing a permanent camp/structure on NFSL, without a permit."

If the Court were to strictly interpret CVB Ticket 3653364, Hinkson could not be found guilty. First, Hinkson did not "construct" the camp. The camp was constructed by Repp nearly forty years ago. Second, "possessing a permanent camp/structure on NFSL, without a permit" does not violate 36 C.F.R. § 261.10(a). The plain language of the 36 C.F.R. § 261.10(a) prohibits only "constructing, placing, or maintaining."

8

At trial, it became apparent to the Court that the Government was attempting to prove Hinkson "maintained" a structure on National Forest System land. But what does it mean to "maintain" a structure? The regulation does not define "maintain." However, maintaining must mean something different than "occupying or using" because 36 C.F.R. § 261.10(b)[7] includes all three terms. *See Walker v. Bain,* 257 F.3d 660, 667 (6th Cir. 2001) ("Every word in the statute is presumed to have meaning, and [the courts] must give effect to all the words to avoid an interpretation which would render words superfluous or redundant.").

In *United States v. Griefen,* 200 F.3d 1256, 1259 (9th Cir. 2000), the defendants were convicted of "maintaining" a structure on national forest land in violation of 36 C.F.R. § 261.10(a). The convictions were based on their conduct protesting a logging operation located in Nez Perce National Forest. *Id.* In an attempt to disrupt the logging operation, the defendants positioned themselves in structures to block the logging operation. *Id.* Eventually, the defendants were forcibly removed from the structures. *Id.* On appeal, the protestors argued that "(1) 'maintain' requires more than mere possession of, or occupation of, a structure; and (2) the word 'maintain' is ambiguous and therefore the rule of lenity and the void-for-vagueness doctrine require reversal." *Id.* at 1265.

In rejecting the defendants' arguments, the Ninth Circuit defined maintain as "to continue or carry on, to preserve or keep in a given condition, and to defend, as against danger or attack." *Id.* (citing Webster's II New Riverside University Dictionary 717 (1984)). Applying that definition to the defendants' conduct, the Ninth Circuit stated:

> [The defendants] were asked several times to leave the structures voluntarily and told they would be arrested if they did not. They refused and remained in the structures, defending and protecting them against the law. As a result, law enforcement officers were forced to remove the [the defendants] from the structures and disassemble the structures before logging contractors could safely proceed with their work. This uncontested evidence establishes that [the defendants]

---

[7] The current version of 36 C.F.R. § 261.10(b) prohibits: "Construction, reconstructing, improving, maintaining, occupying or using a residence on National Forest System lands unless authorized by a special-use authorization or approved operating plan when such authorization is required."

9

> were intent on maintaining the positions of the structures to protest
> and block the logging operations.

*Id.* at 1266.

Similarly, the Ninth Circuit applied the same definition of "maintain" in *United States v. Mack,* 200 F.3d 653 (9th Cir. 2000). Again, in upholding the defendants' convictions, the Ninth Circuit stated:

> [The defendants] were asked several times to leave the structures
> voluntarily or they would be arrested. [Defendants] refused and
> remained in their perches. As a result, law enforcement officers were
> forced to remove the appellants from the structures and to
> disassemble them before logging contractors could safely proceed
> down the road to complete work they had previously started. This
> uncontested evidence establishes that the [defendants] were intent on
> protecting and defending the structures in order to protest and to
> block the logging operations. Such conduct amounts to "maintaining"
> a structure as we have defined that concept in *United States v.
> Griefen,* 200 F.3d 1256 (9th Cir. 2000).

*Mack,* 200 F.3d at 656.

In both *Griefen* and *Mack*, the defendants' convictions of "maintaining" a structure were based in part on the fact that the defendants refused to leave after being instructed to do so by law enforcement officers. *See also United States v. Scranton*, 25 F. Supp. 2d 1131, 1132 (D. Idaho 1997), aff'd, 165 F.3d 920 (9th Cir. 1998) (finding that the defendant's "affirmative refusal to leave the tripod "maintained" the structure under the plain meaning of that word."). In this case, Hinkson was not found in the structure. He was in a deer hunting blind. Moreover, Hinkson was never given the chance to leave. By all accounts, Hinkson cooperated fully on the day Officer Tembruell wrote the ticket. Hinkson also removed the temporary structures within twenty-four hours.

Even though Hinkson was never given a chance to leave before being issued the violation, it appears that Hinkson could still be found guilty of "maintaining" a structure. As stated in *Griefen*, the definition of "maintaining" also includes "to preserve or keep in a given condition."

Here, the Government has not shown that Hinkson preserved or kept the cabin in the given condition. Hinkson apparently acquired an ownership interest in the property when a deed was recorded in 2013, and the CVB Ticket was issued on November 15, 2014. Thus, Hinkson used the cabin on November 15, 2014. He also admitted to using the cabin in the past but did not provide any dates. But, as mentioned above, "maintaining" means something different than "occupying or using."

There is no evidence that Hinkson did anything to preserve the cabin between 2013 and November 15, 2014. The Government did not present any evidence to show that Hinkson was paying the real estate taxes on the land or cabin.[8] Moreover, the Government did not present any evidence that Hinkson did any repairs or improvements to the cabin. There was some testimony that suggested someone may have maintained the areas surrounding the structure, but the Government's witnesses discredited those facts. For example, in July 2014, the grass was short and could have been recently mowed, but the Government's witness testified that the grass may have been short because of the hot and dry weather. Similarly, in July 2014, there was deer feed in the deer baiting station, but the Government's witness testified that that the deer feed could have been there for a while because the drum holds fifty gallons of deer feed. There simply is not enough evidence to establish beyond a reasonable doubt that Hinkson attempted to keep the structure in the same condition.

In addition, a broad application of the word "maintain" raises serious due process concerns when applied to a case where an individual inherits a permanent structure. "Maintain" also includes "to continue or carry on." A permanent structure, like a cabin, will undoubtedly "continue or carry on." It is somewhat confusing what the US Forest Service would have liked Hinkson to do in

---

[8] Officer Tembruell testified that he checked tax records after November 15, 2014, to determine the owner the camp. However, it is unclear who, if anyone, paid the real estate taxes. It may have been Hinkson, Hinkson's mother, or the Hinkson Family Trust.

this situation. He essentially inherited some interest in the illegal structure. Even if he immediately paid for a survey to assess whether the cabin was on National Forest System land, he still would have been guilty of "continuing or carrying on" the permanent structure for some period of time. Simply, any person who inherits a permanent structure that was mistakenly built on National Forest System land could be guilty of a crime. This is an absurd result.

To conclude, the Court finds that the Government has not proven beyond a reasonable doubt that Hinkson violated 36 C.F.R. § 261.10(a). The Court also finds it necessary to comment on the use of prosecutorial discretion in this case. It appears that since November 15, 2014, Hinkson has attempted to work out an arrangement with the US Forest Service so he can keep the camp. It also appears that those efforts have been futile. Why the Government felt it was also necessary to pursue criminal charges is peculiar. This is not a case where an individual accidentally wonders onto national forest land and chops down a tree. *See United States v. Wilson,* 438 F.2d 525, 525 (9th Cir. 1971). Nor is this a case where an individual constructs a temporary structure on national forest land and refuses to remove the structure after being asked to leave. *See United States v. Mack,* 200 F.3d 653, 656 (9th Cir. 2000). This is not even a case where an individual mistakenly builds a cabin on national forest land. Instead, this case involves an individual being charged with a crime for inheriting a permanent structure that was mistakenly built—at the direction of US Forest Service officers—on National Forest System land by a different person nearly forty years ago.

Accordingly, the Court finds Hinkson NOT GUILTY on the charge in CVB Ticket 3653364 because the Government has failed to establish a violation occurred beyond a reasonable doubt.

IT IS ORDERED.

Dated: June 13, 2017

    /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE